GERALD S. KIM
State Bar No. 249886
**BARRETT DAFFIN FRAPPIER**
**TREDER & WEISS, LLP**
20955 Pathfinder Road, Suite 300
Diamond Bar, California 91765
(626) 915-5714 – Phone
(972) 661-7726 - Fax
File No. 1904879
cdcaecf@BDFGroup.com

Attorneys for Secured Creditor
WELLS FARGO HOME MORTGAGE, A DIVISION OF WELLS FARGO BANK, N.A. ITS
ASSIGNS AND/OR SUCCESSORS IN INTEREST

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### (LOS ANGELES DIVISION)

| | |
|---|---|
| In re:<br><br>PHILIS GROOMES-LOVE,<br><br>Debtor(s). | CASE NO.  2:10-bk-40803-BB<br><br>Chapter  11<br><br>**JOINT  STIPULATION RE: (1) VALUATION;  (2) TREATMENT OF WELLS FARGO'S CLAIM UNDER DEBTOR'S PROPOSED CHAPTER 11 PLAN REGARDING 3229 SHORELINE DRIVE PROPERTY; AND (3) CONTINUED USE OF CASH COLLATERAL** |

**TO:     THE   HONORABLE   SHERI   BLUEBOND,   UNITED   STATES
BANKRUPTCY   JUDGE   AND   ALL   PARTIES   IN   INTEREST   AND   THEIR
ATTORNEYS OF RECORD:**

This Stipulation is entered into by and between WELLS FARGO HOME MORTGAGE,
A DIVISION OF WELLS FARGO BANK, N.A. ("Secured Creditor"), its successors and/or
assigns, by and through its attorneys of record, and  PHILIS GROOMES-LOVE, the Debtor and
Debtor-In-Possession herein (the "Debtor"), by and through his attorneys of record.

The property which is the subject of this matter is commonly known as **3229
SHORELINE DRIVE, LAS VEGAS, NEVADA 89113-3310** (hereinafter the "Subject

Property"). On or about November 07, 2006, Debtor as trustee for the Philis G. Love Living Trust, for valuable consideration, made, executed and delivered to Lender a Note in the principal sum of $337,500.00 (the "Note"). A true and correct copy of the Note is attached hereto as Exhibit "A" and incorporated herein by reference.

The Note is secured by a Deed of Trust (the "Deed of Trust") granting Lender a security interest in the Subject Property. The Deed of Trust was recorded on December 11, 2006, as Instrument number 20061211-0002473 in the Official Records of Clark County, State of Nevada. A true and correct copy of the Deed of Trust is attached hereto as Exhibit "B" and incorporated herein by reference.

In or about September 2006, World Savings Bank, FSB was acquired by Wachovia Mortgage, FSB. Subsequently, in or about October 2008, Wachovia Mortgage, FSB ("Lender") merged into Wells Fargo Bank, N.A.

Effective January 20, 2012, Wells Fargo Bank, N.A. A/K/A Wachovia Mortgage, a division of Wells Fargo Bank, N.A. and F/K/A Wachovia Mortgage, FSB is now known as Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A.

On July 26, 2010, Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code and was assigned Bankruptcy Case No. 2:10-bk-40803-BB. On September 03, 2010, Creditor filed a timely Proof of Claim.

THE PARTIES STIPULATE AS FOLLOWS:

1. Creditor shall have a secured claim in the amount of $195,000.00 (the "Secured Claim") to be amortized over 30 years at the interest rate of 5.0% per annum.

2. Creditor shall have an unsecured claim in the amount of at least $83,972.94 (the "Unsecured Claim"). Creditor shall receive, in full and final satisfaction of its Unsecured Claim, its pro rata share of the dividend issued to general unsecured creditors.

///

///

///

3. Debtor shall tender regular monthly payments in the amount of $1,198.91[1] due on the first of each month and late as of the sixteenth day of each month to Creditor for the Secured Claim commencing as of August 1, 2011, to September 01, 2041, when all such outstanding amounts under the Secured Claim are to be paid in full. All payments made under this Stipulation will be credited to the outstanding balance due under the Secured Claim.

4. Debtor shall also tender $753.07 for 60 months starting from Effective Date to cure the arrearages in the amount of $45,184.03 provided for in the Plan.

5. Debtor shall continue to be permitted to use rents generated by the Subject Property to be applied towards payments on Secured Creditor's claim, operating expenses, and general maintenance expenses for the Subject Property and then towards other operational expenses of Debtor's estate.

6. Except as otherwise expressly provided herein, all remaining terms of the Note and Deed of Trust shall govern the treatment of Creditor's Secured Claim.

7. In the event of any future default on any of the above-described provisions, inclusive of this Stipulation, Creditor shall provide written notice via regular mail to Philis Groomes-Love and to Debtor's attorney of record, provided the Debtor's bankruptcy is active, Philip Dapeer, a Law Corporation, 2625 Townsgate Rd, Ste 330, Westlake Village, CA 91361 indicating the nature of default. If Debtor fails to cure the default with certified funds after passage of thirty (30) calendar days from the date said written notice is placed in the mail as reflected on certified mail receipt, then the Creditor shall be entitled to file and serve a declaration under penalty of perjury setting forth in detail the Debtor's failures to perform hereunder, together with a proposed order terminating the stay, which the Court may enter without further notice or hearing.

8. The acceptance by Creditor of a late or partial payment shall not act as a waiver of Creditor's right to proceed by motion hereunder.

9. In the event that Creditor is granted relief from the automatic stay, the parties

---

[1] Payment consists of $1,046.80 Principal and Interest payments in addition to $152.11 escrow impound for county property taxes and hazard insurance. Payment including impound for escrows and other charges are subject to change according to assessment of the Property and pursuant to the Note.

hereby stipulate that the 14-day stay provided by Bankruptcy Rule 4001(a)(3) is waived.

10. In the event the Debtor defaults under this Stipulation and Creditor forwards a 10-day letter to Debtor, he shall be required to tender $100.00 for each default letter submitted in order to cure the default.

11. At the request of the Creditor, the Debtor shall execute such documents and instruments as are reasonably necessary to reflect the Debtor as the borrower of the Secured Claim, and to modify the terms of the obligation to conform with the provisions of this Stipulation.

12. The terms of this Stipulation may not be modified, altered, or changed by the Debtor' Chapter 11 Plan, any confirmation order thereon, any subsequently filed Amended Chapter 11 Plan and confirmation order thereon without the express written consent of the Creditor. The terms of this Stipulation shall be incorporated into the Debtor's Chapter 11 Plan and/or any subsequently filed Amended Chapter 11 Plan.

13. In the event the Debtor's case is dismissed or converted to any other chapter under Title 11 of the United States Bankruptcy Code, Creditor shall retain its lien in the full amount due under the Note, all terms on Creditor's claim shall revert to the original terms of the Note and Deed of Trust and the automatic stay shall be terminated without further notice, order, or proceeding of the court.

14. In the event the Debtor sells the Subject Property prior to confirming their Chapter 11 Plan, Creditor shall be entitled to proceeds from the sale in an amount not less than the outstanding balance owing under the terms of the Note . If the proposed sale for the Property is less than the outstanding balance owing under the Note, then Creditor's written consent must be obtained.

///

///

15. If Debtor sells the Property within five years of the entry of the confirmation order, Debtor will pay Secured Creditor an additional sum of 8% of the sale price over $195,000.00 (the current fair market value of the Property).

16.   In exchange for the foregoing, Secured Creditor shall affirmatively accept Debtor's Plan.

Dated: 5/18/12

PHILIP DAPEER, A LAW
CORPORATION

By: _____
Philip Dapeer
Attorneys for Debtor, Philis Groomes-Love

Dated: July 18, 2012

BARRETT DAFFIN FRAPPIER TREDER
& WEISS, LLP

By: /s/ Gerald S. Kim
Gerald S. Kim
Attorneys for Wells Fargo

WORLD SAVINGS BANK, FSB

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT LOAN

### CERTIFICATES OF DEPOSIT INDEX

### BIWEEKLY PAYMENT

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY BIWEEKLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY BIWEEKLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.**

DATE. **November 7, 2006**

BORROWER(S)  **PHILIS G. LOVE LIVING TRUST, PHILIS G. LOVE,  TRUSTEE** sometimes called "Borrower" and sometimes simply called "I" or "me."

PROPERTY ADDRESS: **3229 SHORELINE DRIVE, LAS VEGAS, NV  89117-3310**

1.    **BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S.  **$270,000.00**, called "Principal," plus interest, to the order of the Lender. The Lender is **WORLD SAVINGS BANK, FSB,  a FEDERAL SAVINGS BANK, ITS SUCCESSORS AND/OR ASSIGNEES**, or anyone to whom this Note is transferred.

2.    **INTEREST**

(A)   **Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid.  I will pay interest at the yearly rate of **7.247%**  The interest rate may change as described in this Section 2. Interest will be charged on the basis of a 364-day year, divided into 26 segments of two weeks each

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note

(B)   **Interest Change Dates**

The interest rate I will pay may change on the **1st** day of **January, 2007** and on every other Monday thereafter. Each date on which my interest rate could change is called an "Interest Change Date."  The new rate of interest will become effective on each Interest Change Date.

SD254A (2004-03-4)                                BIWEEKLY ARM                        NV
                                                  Page 1

0 0 1

LENDER'S USE ONLY

# EXHIBIT A

(C)   Interest Rate Limit

My lifetime maximum interest rate limit is **11.950%** called "Lifetime Rate Cap."

(D)   Index

Beginning with the first Interest Change Date, my interest rate will be based on an "Index". The Index is the average of the last twelve calendar months' most recently published monthly yields on 3-month certificates of deposit (secondary market) as published by the Federal Reserve Board. Lender will calculate the average by adding the twelve most recently published yields together and dividing the result by twelve. Lender will round the result of this division to the nearest one-thousandth of one percentage point (0.001%) by using the following convention: if the value of the 10,000th place is five or greater, the value of the 1,000th place will round up; if the value of the 10,000th place is less than five, the 1,000th place will not change. The most recent Index figure available on each Interest Change Date is called the "Current Index". For purposes of determining the Index, "published" means first made available to the public by the Federal Reserve Board

(E)   Calculation of Interest Rate Changes

Lender will calculate my new interest rate by adding **2.350** percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new "Interest Rate" until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, carryover or add interest to which it is not entitled under this Note on any Interest Change Date.

(F)   Alternative Index

The Lender may choose an alternative index to be the Index if the Index is no longer available  For purposes of this Section 2(F), the Index is not "available" if  (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note.  The selection of the alternative index shall be at Lender's sole discretion.  The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator.  The Lender will give me notice of the alternative index.

3.   PAYMENTS

(A)   Time and Place of Payments

I will pay Principal and Interest by making payments every two weeks.

I will make my first biweekly payment on **December 18, 2006** and every other Monday thereafter. I will make these biweekly payments until I have paid (i) all the Principal and Interest; and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security Instrument. If, on **December 4, 2036**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will maintain a deposit account with Lender, or with a bank or savings and loan which has been approved by Lender, and keep sufficient funds in such deposit account to allow Lender to automatically withdraw my biweekly payment on each of the biweekly payment dates stated above. The sole purpose of the deposit account is to ensure payment of the biweekly payments on the due-date of each payment and I instruct and charge Lender to withdraw the amount of each biweekly payment from the deposit account on each due date without any further instructions from me.

(B)   Amount of My Initial Biweekly Payments

Each of my initial biweekly payments will be in the amount of U.S. $ **465.92**. This amount will change as described in Sections 3(C) and 3(D) below. My initial biweekly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance

(C)   Payment Change Dates

My biweekly payment will change as required by Section 3(D) below beginning on the **17th** day of **December, 2007** and every 52 weeks thereafter. Each of these dates is called a "Payment Change Date." My biweekly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new biweekly payment every other Monday beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

**EXHIBIT A**

**(D)    Calculation of Payment Changes**

Subject to Section 3(F) and 3(G), on the Payment Change Date my biweekly payment may be changed to an amount sufficient to pay the unpaid Principal balance, including any deferred interest as described in Section 3(E) below, by the "Modified Maturity Date." The Modified Maturity Date is the date on which this note will be paid after accounting for acceleration of the payment schedule resulting from biweekly payments rather than the monthly payment schedule used to calculate the Maturity Date described in Section 3(A) above. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap." The Lender will perform this Payment Change calculation at least 50 but not more than 90 days before the Payment Change Date.

**(E)    Deferred Interest; Additions to My Unpaid Principal**

From time to time, my biweekly payments may be insufficient to pay the total amount of biweekly interest that is due. If this occurs, the amount of interest that is not paid each payment, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

**(F)    Limit on My Unpaid Principal; Increased Biweekly Payment**

My unpaid Principal balance can never exceed 125% of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of Deferred Interest to my unpaid Principal balance, the Principal Balance Cap limitation would be exceeded on the date that my biweekly payment is due, I will instead pay a new biweekly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new biweekly payment which is equal to an amount that will be sufficient to repay my then unpaid Principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)    Payment Cap Limitation; Exceptions**

Beginning with the 10th Payment Change Date and every 5th Payment Change Date thereafter, my biweekly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)    Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my biweekly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law

**4.    FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal

**5.    BORROWER'S RIGHT TO PREPAY**

**I have the right to make payments of Principal at any time before they are due. A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so. The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing. I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal. During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.**

# EXHIBIT A

**6.  MAXIMUM LOAN CHARGES**

If a law which applies to this loan and which sets maximum loan charges is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charges for Overdue Payments**

If the Lender has not received the full amount of any biweekly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be **5.00** % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

I will be in default if (i) I do not pay the full amount of each biweekly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading

**(C)  Default - Change to Monthly Payments**

If I fail to have sufficient funds in my deposit account to make my biweekly payment on the date my biweekly payment is due on two occasions in any 12 month period or four occasions any time prior to the Maturity Date or if a garnishment, attachment or seizure is made of or against my deposit account, then I will be in default and Lender will have a right, but not a duty, to change my loan to one with payments due monthly instead of biweekly. If the Lender chooses to change my loan to one with payments due monthly, Lender will provide me with written notice of the change at least 30 days in advance of the date the first monthly payment is due. This notice will also specify the amount of the monthly payment and the date the first monthly payment is due. In such event, interest on the loan balance from the last date interest was paid to the first date of the month preceding the date the first monthly payment is due will be added to my loan balance. The amount of the first monthly payment will be determined without regard to the 7-1/2% change in amount of payment cap set forth in Section 3(D) above.

I understand that I may voluntarily change the payment mode from biweekly to monthly at any time by giving written notice to Lender at least 60 days in advance of the date on which I wish the change to take effect. If I give Lender such notice, Lender will then provide me with written notice of the amount of the monthly payment and the date the first monthly payment shall be due. I may be required to pay a processing fee and sign a Modification Agreement with Lender converting my loan to a monthly payment loan. I understand that should the payment mode be changed from biweekly to monthly either voluntarily or due to an event of default it will not be reversible.

In the event that my payment mode is changed from biweekly to monthly, interest will be charged thereafter on the basis of a 12 month year and a 30-day month. The Interest Rate I will pay will change on the first monthly payment date and on the same day every month thereafter. This revised interest change date will be substituted for the definition of "Interest Change Date" included in Section 2(B) above. The "Payment Change Date" as defined in Section 3(C) above will change to be the date the payment is changed from a biweekly to a monthly payment as described above in this Section 7(C) and on that day every 12 months thereafter.

**(D)  Notice of Default**

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

**(E)  No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full or change my loan type from biweekly to monthly at that time as described above, the Lender will still have the right to do so if I am in default at a later time.

**(F)  Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

SD254D (2004-03-4)                      BIWEEKLY ARM                               NV

Page 4

# EXHIBIT A

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at 3924 MAGNOLIA AVE, LYNWOOD, CA 90262-6264 or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change of my address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at 1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612, or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph 26:

**AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

**Acceleration of Payment of Sums Secured.** Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan will be assumed if

(i)     Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)    Lender approves the creditworthiness of the transferee in writing;

(iii)   transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)    an assumption fee, in an amount of 1% of the balance of principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower, is paid to Lender; and

(v)     the transferee executes an assumption agreement which is satisfactory to Lender, such assumption agreement providing for transferee opening a deposit account with Lender, or with a bank or savings and loan which has been approved by Lender, for direct payment as provided in the secured notes

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

# EXHIBIT A

**12. GOVERNING LAW; SEVERABILITY**

This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note

**13. CLERICAL ERRORS**

In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

**14. LOST, STOLEN OR MUTILATED DOCUMENTS**

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS**

**EXHIBIT A**

**SIGNATURE PAGE**

**NOTICE TO BORROWER(S):**

**BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT CHARGE IN CERTAIN CIRCUMSTANCES. PLEASE CAREFULLY READ THIS ENTIRE NOTE (INCLUDING THE PREPAYMENT PROVISION) BEFORE YOU SIGN IT.**

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED**

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

**BORROWER(S):**

PHILIS G. LOVE LIVING TRUST, PHILIS G. LOVE, TRUSTEE

BY: _Philis B. Love Trustee_ _____ **(Seal)**

   PHILIS  G. LOVE, **TRUSTEE**

**EXHIBIT A**

163-08-011 -

36-02144438

**RECORDING REQUESTED BY:**
WORLD SAVINGS BANK
PREPARED BY:
WHEN RECORDED MAIL TO
WORLD SAVINGS BANK
FINAL DOCUMENTATION
CLOSING DEPARTMENT
P.O. BOX 659548
SAN ANTONIO, TX 78265-9548

RETURN TO:
RECORDING DEPARTMENT
Lenders First Choice
3850 Royal Avenue
Simi Valley, CA 93063

LOAN NUMBER: 0044328673

6

**NOTE AMOUNT: $270,000.00**

**ASSESSOR'S PARCEL NUMBER:**

20061211-0002473

Fee: $30 00
N/C Fee:  $25.00

12/11/2006            12:00:57
T20060216658

Requestor:
RECORD SEARCHING SERVICES

Charles Harvey            BGN
Clark County Recorder     Pgs: 17

SCANNED

FOR RECORDER'S USE ONLY

## DEED OF TRUST

THIS IS A FIRST DEED OF TRUST WHICH SECURES A NOTE WHICH CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, FREQUENCY AND AMOUNT OF PAYMENTS AND PRINCIPAL BALANCE (INCLUDING FUTURE ADVANCES AND DEFERRED INTEREST). AT LENDER'S OPTION THE SECURED NOTE MAY BE RENEWED OR RENEGOTIATED. THE SECURED NOTE PROVIDES FOR BIWEEKLY PAYMENTS OF PRINCIPAL AND INTEREST.

THE MAXIMUM AGGREGATE PRINCIPAL BALANCE SECURED BY THIS DEED OF TRUST IS $337,500.00 WHICH IS 125% OF THE ORIGINAL PRINCIPAL NOTE AMOUNT.

I.    **DEFINITIONS OF WORDS USED IN THIS DEED OF TRUST**

(A)  **Security Instrument.** This Deed of Trust, which is dated **November 7, 2006** will be called the "Security Instrument."

(B)  **Borrower.** PHILIS G. LOVE LIVING TRUST, PHILIS G. LOVE, TRUSTEE sometimes will be called "Borrower" and sometimes simply "I" or "me."

(C)  **Lender. WORLD SAVINGS BANK, FSB, ITS SUCCESSORS AND/OR ASSIGNEES,** will be called "Lender." Lender is a **FEDERAL SAVINGS BANK**, which is organized and exists under the laws of the United States. Lender's address is **1901 Harrison Street, Oakland, CA 94612**.

SD020A (2004-12-3)

Page 1

NV

LENDER'S USE ONLY

**(D)    Note.** The note signed by Borrower and having the same date as this Security Instrument, including all extensions, renewals, substitutions and modifications thereof, will be called the "Note." The Note shows that I owe Lender the original principal amount of U.S. **$270,000.00** ("Note Amount"), plus accrued and deferred interest and such other amounts as stated in the Note. I have promised to pay the debt in regularly scheduled periodic payments as provided in the Note and to pay the debt in full by **December 4, 2036** ("Maturity Date").

**(E)    Property.** The property that is described below in Section III entitled "Description of the Property" will be called the "Property."

**(F)    Sums Secured.** The amounts described below in Section II entitled "Borrower's Transfer of Rights in the Property" sometimes will be called the "Sums Secured."

**(G)    Person.** Any person, organization, governmental authority or other party will be called "Person."

**(H)    Trustor, Beneficiary, Trustee.** Borrower is the "Trustor," Lender is the "Beneficiary" and **Golden West Savings Association Service Co., A California Corporation**, is the "Trustee."

## II.    BORROWER'S TRANSFER OF RIGHTS IN THE PROPERTY

I irrevocably grant and convey the Property to the Trustee, in trust for Lender, with a power of sale subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender and Trustee those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who are beneficiaries of a deed of trust and to trustees of a deed of trust. I am giving Lender and Trustee these rights to protect Lender from possible losses that might result if I fail to:

(i)    pay all amounts owed to Lender under the Note and all other notes secured by this Security Instrument, called the "Secured Notes," including future advances made by Lender and any changes to the Secured Notes made with the written consent of Lender;

(ii)    pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 below to protect the value of the Property and Lender's rights in the Property; and

(iii)    keep all of my other promises and agreements under this Security Instrument, the Secured Notes and any changes to the Secured Notes made with the written consent of Lender.

## III.    DESCRIPTION OF THE PROPERTY

I give Trustee rights in the Property described below:

(i)    The property which is located at **3229 SHORELINE DRIVE, LAS VEGAS, NV 89117-3310**. The legal description of the Property is attached as Exhibit "A" which is made a part of this Security Instrument. This Property is called the "Described Property."

SD020B (2004-12-3)                                                                                    NV
DEFERRED INTEREST                                  **Page 2**

(ii)    All buildings and other improvements that are located on the Described Property;

(iii)    All rights in other property that I have as owner of the Described Property. These rights are known as easements, rights and appurtenances attached to the Property;

(iv)    All rents or royalties and other income from the Described Property;

(v)    All mineral, oil and gas rights and profits, water rights and stock that are part of the Described Property;

(vi)    All rights that I have in the land which lies in the streets or roads in front of, behind or next to, the Described Property;

(vii)    All fixtures that are now or in the future will be on the Described Property or on the property described in subsection (ii) of this Section;

(viii)    All of the rights and property described in subsections (ii) through (vii) of this Section that I acquire in the future;

(ix)    All replacements of or additions to the property described in subsections (ii) through (viii) of this Section; and

(x)    All of the amounts that I pay to Lender under Paragraph 2 below.

**IV.    BORROWER'S RIGHT TO GRANT A SECURITY INTEREST IN THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**
I promise that: (i) I lawfully own the Property; (ii) I have the right to grant and convey the Property to Trustee; and (iii) there are no outstanding claims, charges, liens or encumbrances against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself and the Trustee has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## COVENANTS

I promise and I agree with Lender as follows:

**1.    BORROWER'S PROMISE TO PAY**
I will pay to Lender, on time, all principal and interest due under the Secured Notes and any prepayment and late charges due under the Secured Notes.

**2.    PAYMENTS FOR TAXES AND INSURANCE**

**(A)  Borrower's Obligations**
I will pay all amounts necessary to pay taxes and hazard insurance premiums on the Property as well as assessments, leasehold payments, ground rents or mortgage insurance premiums (if any).

SD020C (2004-12-3)                                                                                    NV

# EXHIBIT B

**(B)    Escrow Accounts**

Subject to applicable law, no escrow shall be required except upon written demand by Lender, in which case, I shall pay to Lender on the day payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes, penalties and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; and (e) yearly mortgage insurance premiums, if any. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for an escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and/or applicable law permits Lender to make such a charge. However, Lender may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay me any interest or earnings on the Funds. Lender shall give to me, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all Sums Secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to me for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify me in writing, and, in such case I shall pay to Lender the amount necessary to make up the deficiency or shortage. I shall make up the deficiency or shortage in accordance with the requirements of the Lender, at its sole discretion, in the manner and times prescribed by RESPA.

Upon payment in full of all Sums Secured by this Security Instrument, Lender shall promptly refund to me any Funds held by Lender. If, under Paragraph 28, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the Sums Secured by this Security Instrument.

**3.    APPLICATION OF BORROWER'S PAYMENTS**

Unless applicable law requires otherwise, Lender will apply each of my payments under the Secured Notes and under Paragraphs 1 and 2 above in the following order and for the following purposes:

SD020D (2004-12-3)                                                                    NV

# EXHIBIT B

First, to pay prepayment charges due under the Secured Notes;

Second, to pay any advances due to Lender under this Security Instrument;

Third, to pay the amounts due to Lender under Paragraph 2 above;

Fourth, to pay interest due under the Secured Notes;

Fifth, to pay deferred interest due under the Secured Notes;

Sixth, to pay principal due under the Secured Notes;

Last, to pay late charges due under the Secured Notes.

## 4.    BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS

I will pay all taxes, assessments and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument.

I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will pay these amounts either by making the payments to Lender that are described in Paragraph 2 above or by making the payments on time to the Person owed them.

Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a lien. I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves in writing the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that Person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give to me a notice identifying the superior lien. I will pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

## 5.    BORROWER'S OBLIGATION TO MAINTAIN INSURANCE

At my sole cost and expense, I will obtain and maintain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of these insurance policies and renewals of the policies must include what is known as a **Standard Mortgagee Clause** to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain earthquake insurance, any other hazard insurance, credit life and/or disability insurance, or any other insurance on or relating to the Property or the Secured Notes and which are not specifically required by Lender, I will name Lender as loss payee of any proceeds.

SD020E (2004-12-3)                                                                                            NV

**EXHIBIT B**                                                                    Page 17

If there is a loss or damage to the Property, I will promptly notify the proper insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "Proceeds." Any Proceeds received will be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining the Proceeds, and then, at Lender's option and in the order and proportion as Lender may determine in its sole and absolute discretion, regardless of any impairment or lack of impairment of security, as follows: (A) to the extent allowed by applicable law, to the Sums Secured in a manner that Lender determines and/or (B) to the payment of costs and expenses of necessary repairs or to the restoration of the Property to a condition satisfactory to Lender, such application to be made in the manner and at the times as determined by Lender.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender or the insurance company stating that the insurance company has offered to settle a claim, Lender may collect the Proceeds. I will notify Lender immediately of any offer to settle a claim from the insurance company. I will immediately deliver any Proceeds I receive from any insurer or other persons to Lender. Lender may use the Proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any Proceeds are used to reduce the amount of the outstanding balance of the Sums Secured, that use will not delay the due date or change the amount of any of my regularly scheduled payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

If Lender acquires the Property under Paragraph 28 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any Proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those Proceeds will not be greater than the total amount of the Sums Secured immediately before the Property is acquired by Lender or sold.

If I am required by Lender to pay premiums for mortgage insurance, I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law.

6.    **BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL ANY LEASE OBLIGATIONS**

I will keep the Property in good repair including, but not limited to, keeping the Property free from debris, mold, termites, dry rot and other damaging pests and infestations. I will not destroy or substantially change the Property and I will not allow the Property to deteriorate. I will keep and maintain the Property in compliance with any state or federal health and safety laws, and hazardous materials and hazardous waste laws. I will not use, generate, manufacture or store any hazardous materials or hazardous waste on, under or about the Property. I will indemnify, defend and hold harmless Lender and its employees, officers and directors and their successors from any claims, damages or costs for required or necessary repair or the removal of mold, termites, dry rot, other damaging pests and infestations and hazardous waste or any other hazardous materials claim. If I do not own but am a tenant on the Property, I will fulfill my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

**EXHIBIT B**                                                                          Page 18

**7.    LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY**

If: (A) I do not keep my promises and agreements made in this Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (including but not limited to any manner of legal proceeding in bankruptcy, in probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever it deems reasonable or appropriate to protect the Lender's rights in the Property. Lender's actions may include, without limitation, appearing in court, paying reasonable attorneys' fees, purchasing insurance required under Section 5, above (such insurance may cost more and provide less coverage than the insurance I might purchase), and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. Although Lender may take action under this Paragraph 7, Lender does not have to do so. Any action taken by Lender under this Paragraph 7, will not release me from my obligations under this Security Instrument.

I will pay to Lender any amounts which Lender advances under this Paragraph 7 with interest, at the interest rate in effect under the Secured Notes. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. Interest on each amount will begin to accrue on the date that the amount is advanced by Lender. However, Lender and I may agree in writing to terms that are different from those in this Paragraph 7. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

**8.    LENDER'S RIGHT TO INSPECT THE PROPERTY**

Lender, and others authorized by Lender, may enter upon and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

**9.    AGREEMENTS ABOUT GOVERNMENTAL TAKING OF THE PROPERTY**

I assign to Lender all my rights: (A) to proceeds of all awards or claims for damages resulting from condemnation, eminent domain or other governmental taking of all or any part of the Property; and (B) to proceeds from a sale of all or any part of the Property that is made to avoid condemnation, eminent domain or other governmental taking of the Property. All of those proceeds will be paid to Lender. If I receive any such proceeds, I will immediately deliver them to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the Sums Secured have been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the Sums Secured will be reduced only by the amount of proceeds multiplied by the following fraction: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds and settle the claim. Lender may then use the proceeds to reduce the Sums Secured. The 30-day period will begin when the notice is given.

SD020G (2004-12-3)

NV

**EXHIBIT B**

If any proceeds are used to reduce the amount of the outstanding principal of the Secured Notes, that use will not delay the due date or change the amount of any of my regularly scheduled payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

### 10.    CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS

#### (A)    Borrower's Obligations

Lender may allow a Person who takes over my rights and obligations subject to this Security Instrument to delay or to change the amount of the payments of principal and interest due under the Secured Notes or under this Security Instrument. Even if Lender does this, however, that Person and I will both still be fully obligated under the Secured Notes and under this Security Instrument.

Lender may allow those delays or changes for a Person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a Person for not fulfilling obligations under the Secured Notes or under this Security Instrument, even if Lender is requested to do so.

#### (B)    Lender's Rights

Even if Lender does not exercise or enforce any of its rights under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 28 below to demand that I make immediate payment in full of the Sums Secured.

### 11.    OBLIGATIONS OF BORROWER, CO-SIGNORS AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS

Except as provided below, if more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured.

Any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signor"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signor's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the Sums Secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the term of this Security Instrument or Note without the co-signor's consent.

Any Person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

**EXHIBIT B**

**12.    MAXIMUM LOAN CHARGES**
If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limits and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the outstanding principal balance of the Secured Notes or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Secured Notes.

**13.    LEGISLATION AFFECTING LENDER'S RIGHTS**
If a change in applicable law would make any provision of the Secured Notes or this Security Instrument unenforceable, Lender may require that I make immediate payment in full of all Sums Secured by this Security Instrument.

**14.    NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT**
Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at **3924 MAGNOLIA AVE, LYNWOOD, CA 90262-5254.**  A notice will be given to me at an alternative address if I give Lender notice of my alternative address. I may give notice to Lender of my alternative address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes. Except as permitted above for changes of address, any notice that must be given to Lender under this Security Instrument will be given by mailing it by first class mail to Lender's address stated in Section I.(C) above entitled, "Definitions of Words Used in this Deed of Trust," unless Lender gives me notice of a different address. Any notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

**15.    GOVERNING LAW; SEVERABILITY**
This Security Instrument and the Secured Notes shall be governed by and construed under federal law and federal rules and regulations, including those for federally chartered savings institutions ("Federal Law") and, to the extent Federal Law does not apply, by the law of the jurisdiction in which the Property is located. In the event that any of the terms or provisions of this Security Instrument or the Secured Notes are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Security Instrument or the Secured Notes.

**16.    BORROWER'S COPY**
I acknowledge the receipt of one conformed copy of the Secured Notes and of this Security Instrument.

**17.    LENDER'S RIGHTS TO RENTAL PAYMENTS AND TO TAKE POSSESSION OF THE PROPERTY**
If Lender requires immediate payment in full or if I abandon the Property, then Lender, Persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (A) collect the rental payments, including overdue rental payments, directly from the tenants; (B) enter upon and take

SD020I (2004-12-3)                                                                                                      NV

**EXHIBIT B**

possession of the Property; (C) manage the Property; and (D) sign, cancel and change rental agreements and leases. If Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 17, I agree that the tenants may make those rental payments to Lender without having to ask (i) Lender whether I have failed to keep my promises and agreements under this Security Instrument, or (ii) me for my permission to do so.

If Lender acts to have the Property sold after a Breach of Duty as defined in Paragraph 28, I understand and agree that: (A) my right to occupy the Property ceases at the time the Property is sold; (B) I shall have no right to occupy the Property after such sale without the written consent of the new owner of the Property; and (C) my wrongful and unlawful possession of the Property may subject me to monetary damages, including the loss of reasonable rent and the cost of eviction. All rental payments collected by Lender or by a receiver, other than the rent paid by me under this Paragraph 17, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the Sums Secured. The costs of managing the Property may include the receiver's fees, reasonable attorneys' fees and the costs of any necessary bonds.

**18.     INJURY TO PROPERTY; ASSIGNMENT OF RIGHTS**

An **assignment** is a transfer of rights to another. I may have rights to bring legal action against persons, other than Lender, for injury or damage to the Property or in connection with the loan made to me by Lender and which arose or will arise before or after the date of this Security Instrument. These rights to bring legal action may include but are not limited to an action for breach of contract, fraud, concealment of a material fact or for intentional or negligent acts. I assign these rights, and any and all proceeds arising from these rights, as permitted by applicable law, to Lender. Lender may, at its option, enforce these rights in its own name and may apply any proceeds resulting from this assignment to the Sums Secured after deducting any expenses, including attorneys' fees, incurred in enforcing these rights. At the request of Lender, I will sign any further assignments or other documents that may be necessary to enforce this assignment. I will notify Lender immediately if I believe I have the right to bring any such legal action against any persons, and will notify Lender immediately if I assert any claim or demand against or commence any legal action against any such person. If I receive any proceeds from any persons besides Lender in connection with any such claim, demand or legal action, I will immediately deliver such proceeds to Lender.

**19.     CLERICAL ERRORS**

In the event Lender at any time discovers that this Security Instrument, the Secured Notes or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from Lender, to execute such documentation as Lender deems necessary to correct any such error(s) and I also agree that I will not hold Lender responsible for any damage to me which may result from any such error.

**20.     LOST, STOLEN OR MUTILATED DOCUMENTS**

If any of the Loan Documents are lost, stolen, mutilated or destroyed and Lender delivers to me an indemnification in my favor, signed by Lender, then I will sign and deliver to Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**21.     WAIVER OF STATUTE OF LIMITATIONS**

I will waive, within applicable law, the pleading of the statute of limitations as a defense to enforce this Security Instrument, including any obligations referred to in this Security Instrument or Secured Notes.

SD020J (2004-12-3)                                                                                              NV

# EXHIBIT B

**22.   CAPTIONS**

The captions and headings at the beginning of each paragraph of this Security Instrument are for reference only and will not be used in the interpretation of any provision of this Security Instrument.

**23.   MODIFICATION**

This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

**24.   CONDOMINIUM, COOPERATIVE AND PLANNED UNIT DEVELOPMENT OBLIGATIONS**

If the Property is a unit in a condominium, cooperative or planned unit development, each of which shall be called the "Project," and I have an interest in the common elements of the Project, then Lender and I agree that:

**(A)**   If an owners association or other entity, called "Owners Association," holds title to Property for the benefit or use of the Project and its members or shareholders, the Property also includes my interest in the Owners Association and the uses, proceeds and benefits of my interest.

**(B)**   The following are called the "Constituent Documents:" (i) The declaration or any other document which created the Project; (ii) By-laws of the Owners Association; (iii) Code of regulations for the Project; (iv) Articles of Incorporation, trust instrument or equivalent document which creates the Owners Association; (v) The Project's covenants, conditions and restrictions; (vi) Other equivalent documents.

I shall perform all of my obligations under the Constituent Documents, including my obligation to pay, when due, all dues and assessments. If I do not pay the dues and assessments when due, Lender may, at its option, pay them. I will pay to Lender any amounts which Lender advances under this Paragraph 24 according to the terms described in Paragraph 7 above.

**(C)**   If the Owners Association maintains, with an insurance company reasonably acceptable to Lender, a master or blanket policy on the Project which is satisfactory to Lender and which provides insurance coverage on the terms, in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," and Lender is provided with evidence of such coverage, then: (i) Lender waives the provision in Paragraph 2(B) above for the payment to Lender of the estimated yearly premium installments for hazard insurance on the Property; and (ii) hazard insurance coverage on the Property as required by Paragraph 5 above is deemed to be satisfied to the extent that the required coverage is provided by the Owners Association policy. I shall give Lender prompt notice of any lapse in the required hazard insurance coverage. I shall provide a copy of such master or blanket policy to Lender annually.

In the event of a distribution of any hazard insurance proceeds, including without limitation any earthquake or special hazards insurance whether or not such coverage was required by Lender, in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to me are hereby assigned and shall be paid to Lender for application to the Sums Secured by this Security Instrument, with any excess paid to me. If I receive any such proceeds, I will immediately deliver them to Lender or otherwise apply them as set forth above.

SD020K (2004-12-3)                                                                                    NV

**EXHIBIT B**

I shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable to Lender in form, amount and extent of coverage.

**(D)** I shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of condemnation, eminent domain or other governmental taking; (ii) any amendment to any provision of Constituent Documents unless the provision is for the express benefit of Lender or of lenders generally; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the **master** or **blanket** hazard insurance policy and/or the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

## 25.    FUTURE ADVANCES

At Borrower's request, Lender, at its option (but before release of this Security Instrument or the full reconveyance of the Property described in the Security Instrument) may lend future advances, with interest, to Borrower. Such future advances, with interest, will then be additional Sums Secured under this Security Instrument.

## 26.    AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

<u>Acceleration of Payment of Sums Secured.</u> Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

<u>Exception to Acceleration of Payment of Sums Secured.</u> If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)    Lender approves the creditworthiness of the transferee in writing;

(iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

SD020L (2004-12-3)                                                                              NV

# EXHIBIT B

(iv)      an assumption fee, in an amount of 1% of the outstanding balance of principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower, is paid to Lender; and

(v)      the transferee executes an assumption agreement which is satisfactory to Lender. Such assumption agreement may provide, if required by Lender, that the transferee open a deposit account with lender or with a bank or other depository institution approved by Lender, to facilitate direct payments if direct payments are required in the Note.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

## 27.    SUBSTITUTE TRUSTEE

Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the city or county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by applicable law.

## 28.    RIGHTS OF THE LENDER IF THERE IS A BREACH OF DUTY

It will be called a "Breach of Duty" if: (i) I do not pay the full amount of each regularly scheduled payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under the Note or this Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading. If there is a Breach of Duty by me, Lender may demand an immediate payment of all Sums Secured.

If there is a Breach of Duty by me, Lender may exercise the power of sale, take action to have the Property sold under applicable law, and invoke such other remedies as may be permitted under any applicable law.

Lender does not have to give me notice of a Breach of Duty. If Lender does not make a demand for full payment of the Sums Secured upon a Breach of Duty, Lender may make a demand for full payment of the Sums Secured upon any other Breach of Duty.

If there is a Breach of Duty, Lender may also take action to have a receiver appointed to collect rents from any tenants on the Property and to manage the Property. The action to appoint a receiver may be taken without prior notice to me and regardless of the value of the Property.

The sale of the Property may be postponed by or at the direction of Lender. If the Property is sold, I agree that it may be sold in one parcel. I also agree that Lender may add to the amount that I owe to Lender all legal fees, costs, allowances, and disbursements incurred as a result of the action to sell the Property.

Lender will apply the proceeds from the sale of the Property in the following order: (A) to all fees, expenses and costs incurred in connection with the sale, including but not limited to trustees' and attorneys' fees, if any; (B) to all Sums Secured by this Security Instrument; and (C) any excess to the Person or Persons legally entitled to it.

**EXHIBIT B**

**29. RECONVEYANCE**

Upon payment of all Sums Secured, by this Security Instrument Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all Secured Notes to Trustee. Trustee shall reconvey the Property without warranty to Borrower. Lender may charge Borrower a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (including the Trustee) for services rendered and the charging of the fee is permitted, whether expressly or by lack of express prohibition, under applicable law. If the fee charged does not exceed any maximum fee set by applicable law, the fee is conclusively presumed to be reasonable.

**30. STATEMENT OF OBLIGATION**

Lender may collect a fee of $60.00, or such greater maximum amount as may from time to time be allowed by law, for furnishing any statement of obligation with respect to this Security Instrument or the Secured Notes.

**31. ( x ) QUICK QUALIFYING LOAN PROGRAM**

I have qualified for this loan by making statements of fact which were relied upon by Lender to approve the loan rapidly. This loan is called a "Quick Qualifying Loan." I have stated and I confirm that: (A) I do not have any other Quick Qualifying Loans with Lender; (B) I have agreed to not further encumber the Property and do not intend to further encumber the Property for at least six months after the date of the Secured Notes and this Security Instrument; and (C) If I am purchasing the Property, all of the terms of the purchase agreement submitted to Lender are true and the entire down payment is cash from my own funds.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin subject to the Lifetime Rate Cap stated in the Secured Notes.

**32. (  ) OWNER OCCUPANCY**

Lender has relied upon statements of fact which I have made to qualify for this loan. I have stated and confirm that: (A) the Property is my personal and primary residence; (B) I will occupy the Property not later than 30 days after this Security Instrument is recorded; and (C) I will use the Property as my residence for at least 12 months from the date this Security Instrument is recorded.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin, subject to the Lifetime Rate Cap stated in the Secured Notes.

**( X ) VALUE INDICATES THAT THE PARAGRAPH APPLIES.**

SD020N (2004-12-3)                                                                              NV

# EXHIBIT B

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in this Security Instrument and in any rider(s) signed by me and recorded in proper official records.

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

**BORROWER(S):**

PHILIS G. LOVE LIVING TRUST, PHILIS G. LOVE, TRUSTEE

BY: _Phili B. Love, trustee_ _____    (Seal)

      PHILIS   G. LOVE, TRUSTEE

Mailing Address:  PHILIS G LOVE LIVING TRUST PHILIS G LOVE TRUSTEE
                    3924 MAGNOLIA AVE, LYNWOOD, CA  90262-5254

**ATTACH TRUST NOTARY ACKNOWLEDGEMENT**

SD020 (2004-03-1)          [F15 (2004-03-1)]          Page 15                              NV
                      [AL7 (2004-03-1)]

# EXHIBIT B

## California All-Purpose Acknowledgement

State of California

County of _Los Angeles_                    ⸨ ss

On _11-8-06_ before me, _E. Taylor-Clark, notary public_
     (Date)                           Name, Title/Capacity, Notary Public
personally appeared _Philis G. Love_
                           Name of Signer(s)

☐ Personally known to me
**-OR-**
☒ Proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that she/he/they executed the same in her/his/their authorized capacity(ies) and that by her/his/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal

_E. Taylor-Clark notary public_
                  Signature of Notary Public

```
E. TAYLOR-CLARK
Commission # 1415874
Notary Public - California
Los Angeles County
My Comm. Expires May 5, 2007
```

Place Notary Seal and/or Any Stamp above

---

### Optional Information

Law does not require the information below. This information could be of great value to any person/persons relying on this document and could prevent fraudulent and/or the reattachment of this document to an unauthorized document(s).

**DESCRIPTION OF ATTACHED DOCUMENT**
TITLE OR TYPE OF DOCUMENT  _Deed of Trust_
DATE OF DOCUMENT _____  NUMBER OF PAGES  _15_
SIGNER(S) IF DIFFERENT THAN ABOVE _____
OTHER INFORMATION _____

**CAPACITY CLAIMED BY SIGNER (S)**
SIGNER(S) NAME(S)  _Philis G. Love_
☒ INDIVIDUAL
☐ CORPORATE OFFICER
    _____
           Title(s)
☐ PARTNER(S)
☐ ATTORNEY-IN-FACT
☒ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER: _____
_____
_____

**SIGNER IS REPRESENTING:**
NAME OF PERSON(S) OR ENTITY(IES) _____

© 2004 NOTARY PUBLIC SEMINARS SUPPLIES • REORDER ITEM# ACK • FAX 310-915-0147 • www.notarypublicseminars.com

## EXHIBIT B

EXHIBIT "A"


THE REAL PROPERTY LOCATED AT 3229 SHORELINE DRIVE, LAS VEGAS,
NEVADA 89117 AND DESCRIBED AS FOLLOWS:

LOT 193, BLOCK E, PLAT BOOK 34, PAGE 27 IN THE COUNTY OF CLARK,
STATE OF NEVADA.

FOR INFORMATIONAL PURPOSES ONLY: THE APN IS SHOWN BY THE COUNTY
ASSESSOR AS 163-08-811-021; SOURCE OF TITLE IS DOCUMENT NO.
20060718-0000564 (RECORDED 07/18/06)

**EXHIBIT B**

**EXHIBIT C**

**Office of Thrift Supervision**
Department of the Treasury

1700 G Street, N.W., Washington, D.C. 20552 • (202) 906-6000

**April 21, 2006**

## CERTIFICATE OF CORPORATE EXISTENCE

**REFERENCE:** World Savings Bank, FSB
Oakland, California

I, Nadine Y. Washington, Corporate Secretary, Office of Thrift Supervision, hereby certify, according to the records of the Office of Thrift Supervision, Department of the Treasury, Washington, DC:

1. World Savings Bank, FSB, Oakland, California, was chartered under the laws of the United States to transact the business of a Federal savings bank;

2. The charter of World Savings Bank, FSB, Oakland, California, is in full force and effect;

3. The Office of Thrift Supervision has not appointed a conservator or receiver for World Savings Bank, FSB, Oakland, California; and

4. As of April 21, 2006, World Savings Bank, FSB, Oakland, California, is operating as a BIF-insured financial institution.

**Nadine Y. Washington**
**Corporate Secretary**

**EXHIBIT C**

**EXHIBIT C**



**Office of Thrift Supervision**
Department of the Treasury

*Nicholas J. Dyer*
*Assistant Regional Director*

Pacific Plaza, 2001 Junipero Serra Boulevard, Suite 650, Daly City, CA 94014-1976
P.O. Box 7165, San Francisco, CA 94120-7165 • Telephone: (650) 746-7025 • Fax: (650) 746-7001

November 19, 2007

John A. Stoker, Esq.
Vice President and Assistant General Counsel
Wachovia Corporation
Legal Division – NCO630
One Wachovia Center
301 South Charlotte Street
Charlotte, NC 28288

Re:  World Savings Bank, FSB, Oakland, California
Notice of Amendment of Charter and Bylaws

Dear Mr. Stoker:

This is in response to your letter, dated November 8, 2007, with enclosures, which you filed with the Office of Thrift Supervision (OTS) on behalf of World Savings Bank, FSB to amend the savings bank's charter and bylaws to change its name to Wachovia Mortgage, FSB and reflect a change in the location of its home office.  The new home office address is 6825 Aliante Parkway, North Las Vegas, Nevada.

The institution met the requirements of 12 C.F.R. §§ 552.4(b) and 552.5(b)(2), and the proposed amendments will be effective December 31, 2007, as set forth in the Board of Directors' resolution adopting the changes to the charter and bylaws.  The filing also met the requirement of 12 C.F.R. § 545.91(b) that the savings bank notify the OTS if there is a change in the permanent address of its home office.

Please feel free to contact me at (650) 746-7025 if there are any questions.

Sincerely,

*Nicholas J. Dyer*

Nicholas J. Dyer
Assistant Regional Director

cc:  Robert Burns, FDIC - Atlanta

# EXHIBIT C

**EXHIBIT C**

## SECRETARY'S CERTIFICATE
## WACHOVIA MORTGAGE, FSB

I, Hope Armstrong Howe, Assistant Secretary of Wachovia Mortgage, FSB (the "Bank") do hereby certify the following:

1. Attached hereto as Charter No. 7971, is a true and complete copy of the Charter of Wachovia Mortgage, FSB (the "Charter") effective December 31, 2007 and signed by the Secretary and the Director of the Office of Thrift Supervision, and that said Charter is now in full force and effect.

**IN WITNESS WHEREOF,** I have hereunto subscribed my name and affixed the seal of the Bank on this 16th day of March, 2009.



(SEAL)

*Hope Armstrong Howe*

Hope Armstrong Howe
Assistant Secretary
Wachovia Mortgage, FSB

**EXHIBIT C**

Page 35

Charter No. <u>7971</u>
Docket No. 12642

## CHARTER OF WACHOVIA MORTGAGE, FSB

Section 1.  <u>Corporate title.</u>  The full corporate title of the savings bank is Wachovia Mortgage, FSB ("the savings bank").

Section 2.  <u>Office.</u>  The home office of the savings bank shall be located in North Las Vegas, Nevada.

Section 3.  <u>Duration.</u>  The duration of the savings bank is perpetual.

Section 4.  <u>Purpose and Powers.</u>  The purpose of the savings bank is to pursue any or all of the lawful objectives of a Federal savings bank chartered under section 5 of the Home Owners' Loan Act and to exercise all of the express, implied, and incidental powers conferred thereby and by all acts amendatory thereof and supplemental thereto, subject to the Constitution and laws of the United States as they are now in effect, or as they may hereafter be amended, and subject to all lawful and applicable rules, regulations, and orders of the Office of Thrift Supervision ("OTS").

Section 5.  <u>Capital Stock.</u>  The total number of share of all classes of the capital stock which the savings bank has the authority to issue is 30,000, all of which shall be common stock of par value of $10.00 per share.  The shares may be issued from time to time as authorized by the board of directors without the approval of its shareholders, except as otherwise provided in this Section 5 or to the extent that such approval is required by governing law, rule, or regulation.  The consideration for the issuance of the shares shall be paid in full before their issuance and shall not be less than the par value.  Neither promissory notes nor future services shall constitute payment or part payment for the issuance of shares of the savings bank.  The consideration for the shares shall be cash, tangible or intangible property (to the extent direct investment in such property would be permitted to the savings bank), labor, or services actually performed for the savings bank, or any combination of the foregoing.  In the absence of actual fraud in the transaction, the value such property, labor, or services, as determined by the board of directors of the savings bank, shall be conclusive.  Upon payment of such consideration, such shares shall be deemed to be fully paid and nonassessable.  In the case of a stock dividend, that part of the surplus of the savings bank which is transferred to stated capital upon the issuance of shares as a share dividend shall be deemed to be the consideration for their issuance.

No shares of common stock shall be issued, directly or indirectly, to officers, directors, or controlling persons of the savings bank other than as part of a general public offering or as qualifying shares to a director, unless the issuance or the plan under which they would be issues has been approved by a majority of the total votes eligible to be cast at a legal meeting.

**EXHIBIT C**

The holders of the common stock shall exclusively possess all voting power. Each holder of shares of common stock shall be entitled to one vote for each share held by such holder, except as to the cumulation of votes for election of directors. In the event of any liquidation, dissolution, or winding up of the savings bank, the holder of the common stock shall be entitled, after payment or provision for payment of all debts and liabilities of the savings bank, to receive the remaining assets of the savings bank available for distribution, in cash or in kind. Each share of common stock shall have the same relative rights as and be identical in all respects with all the other shares of common stock.

Section 6. <u>Preemptive rights.</u> Holders of the capital stock of the savings bank shall not be entitled to preemptive rights with respect to any shares of the savings bank which may be issued.

Section 7. <u>Directors.</u> The savings bank shall be under the direction of a board of directors. The authorized number of directors, as stated in the savings bank's bylaws, shall not be fewer than five nor more than fifteen except when a greater number is approved by the Director of the OTS.

Section 8. <u>Amendment of charter.</u> Except as provided in Section 5, no amendment, addition, alteration, change or repeal of this charter shall be made, unless such is first proposed by the board of directors of the savings bank, then preliminarily approved by the OTS, which preliminary approval may be granted by the OTS pursuant to regulations specifying preapproved charter amendments, and thereafter approved by the shareholders by a majority of the total votes eligible to be cast at a legal meeting. Any amendment, addition, alternation, change, or repeal so acted upon shall be effective upon filing with the OTS in accordance with regulatory procedures or on such other date as the OTS may specify in its preliminary approval.

Attest: _____
          Mark C. Treanor, Secretary
          Wachovia Mortgage, FSB

Attest: _____
          Benjamin P. Jenkins, III, Chairman, President & CEO
          Wachovia Mortgage, FSB

Attest: _____
          Secretary of the Office of Thrift Supervision

Attest: _____
          Director of the Office of Thrift Supervision

Effective Date:  December 31, 2007

**EXHIBIT C**

**EXHIBIT C**



**Comptroller of the Currency**
**Administrator of National Banks**

Large Bank Licensing

November 1, 2009

Mr. James E. Hanson
Vice President
Wells Fargo Bank, National Association
90 South Seventh Street
Minneapolis, MN 55479

Re:    Application to convert Wachovia Mortgage, FSB, North Las Vegas, Nevada to a national
       bank and application to merge the converted bank with and into Wells Fargo Bank,
       National Association, Sioux Falls, South Dakota
       Application Control Numbers:  2009-ML-01-0007 and 2009-ML-02-0010

Dear Mr. Hanson:

This letter is the official certification of the Comptroller of the Currency (OCC) of the
conversion of Wachovia Mortgage FSB, North Las Vegas, Nevada to a national bank with the
name Wells Fargo Bank Southwest, National Association, effective November 1, 2009.  This is
also the official certification to merge Wells Fargo Bank Southwest, National Association with
and into Wells Fargo Bank, National Association, Sioux Falls, South Dakota, effective
November 1, 2009.

If you have questions regarding this letter, please contact me at (202) 874-5294 or by email at:
Stephen.Lybarger@occ.treas.gov .  Please reference the application control number or numbers
in any correspondence.

Sincerely,

Stephen A. Lybarger
Large Bank Licensing Lead Expert

**EXHIBIT C**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 20955 Pathfinder Road, Suite 300, Diamond Bar, CA 91765.

A true and correct copy of the foregoing document entitled (*specify*): Joint Stipulation Re: (1) Valuation; (2) Treatment of Wells Fargo's Claim under Debtor's Proposed Chapter 11 Plan Regarding 3229 Shoreline Drive Property; and (3) Continued Use of Cash Collateral, will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 23, 2012, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**U.S. Trustee:** ustpregion16.la.ecf@usdoj.gov
**Attorney for U.S. Trustee:** Melanie C. Scott: Melanie.Scott@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) August 23, 2012, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**Judge:** Hon. Sheri Bluebond/Intake, U.S. Bankruptcy Court, 255 East Temple Street, Los Angeles, CA 90012
**Debtor:** Philis Groomes-Love, 3924 Magnolia Avenue, Lynwood, CA 90262-5254
**Debtor:** Philis Groomes-Love, 3229 Shoreline Drive, Las Vegas, NV 89113-3310
**Attorney for Debtor:** Philip D. Dapeer, 2625 Townsgate Road, Suite 330, Westlake Village, CA 91361

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 23, 2012 | GERALD S. KIM | /s/ Gerald S. Kim |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

# PROOF OF SERVICE OF DOCUMENT CONTINUED

**CONTINUED FROM SECTION 2, ADDITIONAL SERVICE**

**20 LARGEST UNSECURED CREDITORS**

Direct TV, Attn. Managing or Servicing Agent, P. O. Box 78626, Phoenix, AZ 85062
CBCS, Attn. Managing or Servicing Agent, P. O. Box 163250, Columbus, OH 45500
Gill Jarmond, 1827 12th Avenue, Los Angeles, CA 90000
Carolyn Jackson, 4526 Carlin Avenue, Lynwood, CA 90262
Jannice R. Groomes, 2924 Magnolia Avenue, Lynwood, CA 90262
Home Depot Credit Services, Attn. Managing or Servicing Agent, P. O. Box 6028, The Lakes, NV 89000
Citibank, Attn. Managing or Servicing Agent, P. O. Box 469100, Escondido, CA 90000
James W. Groomes, 120 East Maple Street, Compton, CA 90220
American Express, Attn. Managing or Servicing Agent, Box 0001, Los Angeles, CA 90000
Willie Gaines, 4416 Charnela Court, Las Vegas, NV 89000
Citicorp Credit Services, Inc. Payment Processing Center, Attn. Managing or Servicing Agent, P. O. Box 2695, Waterloo, IA 5074-2695
Sears Credit Cards, Attn. Managing or Servicing Agent, P. O. Box 688956, Des Moines, IA 50368-8956
Wells Fargo Card Services, Attn. Managing or Servicing Agent, P. O. Box 30086, Los Angeles, CA 90000

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**